UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZACHARY R. CHERTOK and ELIOT JOKELSON,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF MEDFORD, MEDFORD CITY COUNCIL, and BREANNA LUNGO-KOEHN, in their official capacities,<br><br>Defendants. | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Civil Action No. 1:26-cv-10589 |

Plaintiffs Zachary R. Chertok and Eliot Jokelson ("Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion for Preliminary Injunction. Plaintiffs seek to preserve the status quo and prevent the implementation of an unlawful municipal ordinance that compels public officials to divert and mismanage public funds in excess of municipal authority, in violation of statutory fiduciary duties, and in conflict with state and federal law.

**INTRODUCTION**

This case concerns the limits of municipal power over public investment. The City of Medford has enacted the Ordinance mandating divestment from broad categories of lawful enterprises — including weapons manufacturers, fossil fuel companies, private prison operators, and entities alleged to engage in "human rights violations" — based not on individualized financial risk assessment, but on ideological and political judgments.

Massachusetts law does not authorize municipalities to impose categorical divestment mandates that (i) are unmoored from state-mandated return-on-investment considerations, (ii) are unsanctioned by municipal-enabling state law, (iii) undermine the fulfillment of municipal

1

trustees' fiduciary duties, or (iv) encroach upon the federal government's sole authority over foreign relations. Moreover, Massachusetts imposes strict fiduciary obligations on those who manage public funds, thereby foreclosing the passage of legislation that compels pension and trust fiduciaries to violate duties imposed by the Legislature and enforced by the courts.

The Ordinance is thus ultra vires, preempted by federal and state law, and constitutionally defective. Because Plaintiffs are likely to succeed on the merits, the threatened harm is imminent and irreparable, the balance of equities favors relief, and an injunction serves the public interest, preliminary relief is warranted under Federal Rule of Civil Procedure 65.

## FACTUAL BACKGROUND

On or about August 5, 2025, the City of Medford enacted the Values-Aligned Local Investments Ordinance. (Verified Compl. ¶ 12.) The Ordinance requires or directs municipal officials and boards to divest current holdings and refrain from future investment in companies falling within specified prohibited categories. (Verified Compl. ¶ 13.)

The Ordinance was passed in third reading in September 2025 but was vetoed on or about October 13, 2025, by Mayor Breanna Lungo-Koehn, who cited legal and financial concerns. The Medford City Council overrode the veto in a 6–1 vote on or about November 12, 2025. (Verified Compl. ¶ 14.)

The Ordinance applies to general municipal funds, trust or reserve funds, and, by its terms or effect, may reach pension or quasi-pension assets. (Verified Compl. ¶ 15.) In pertinent part, Section D of the Ordinance provides the City is prohibited from investing in:

> any company or entity that is directly, knowingly and over time contributing to severe violations of human rights and international humanitarian law as determined by international legal and humanitarian bodies and conventions including the United Nations, including, but not limited to, complicity in killings, physical abuse,

displacement or other rights violations, confinement, forced labor, human rights violations based on racial, gender or LGBTQ+ identity, war crimes, crimes against humanity, apartheid, genocide, ethnic cleansing, and illegal occupation, and complicity with such actions by governments or other parties.

(Verified Compl. ¶ 16.)

The Ordinance's criteria for disqualification are vague and subjective. Nowhere does the Ordinance define its key operative terms, including "contributing," "complicity," or "severe violations of human rights." (Verified Compl. ¶ 17.) The Ordinance requires divestment from, refusal to deposit funds with, or mandatory withdrawal from certain financial institutions and entities based on non-financial, ideological criteria, without regard to the City's financial needs. (Verified Compl. ¶ 18.)

## STANDARD FOR PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a movant must satisfy the four-factor test articulated by the Supreme Court and applied by the First Circuit. The movant must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent relief; (3) that the balance of equities tips in its favor; and (4) that the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 10 (2008); *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). In the First Circuit, likelihood of success on the merits is the most critical factor and is often described as the "sine qua non" of the analysis. *Sindicato Puertorriqueño de Trabajadores*, 699 F.3d at 10; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).

Where the preliminary injunction involves constitutional claims or governmental action, courts recognize that the public interest and balance-of-equities factors merge with the merits analysis. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government has no legitimate interest in

3

enforcing an unconstitutional or unlawful enactment, and the public interest is served by preventing violations of federal law and the Constitution. *See id.*

Where, as here, the challenged governmental action is ultra vires, preempted by state and federal law, and compels fiduciaries to violate state law, likelihood of success becomes dispositive, as courts do not defer to unlawful exercises of municipal power, and the public interest weighs heavily in favor of enjoining enforcement of void enactments. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000).

**ARGUMENT**

**I.    Plaintiffs Are Likely to Succeed on the Merits**

**A. The Ordinance Is Preempted by the Federal Government's Exclusive Authority Over Foreign Affairs**

**1.  *The Supremacy Clause and the Foreign Affairs Doctrine Preclude Municipal Regulation of Foreign Policy***

Under the Supremacy Clause, the Constitution and federal statutes "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The Supremacy Clause gives Congress the power to preempt state and municipal law, either expressly or impliedly. *See Capron v. Off. of the Att'y Gen. of Mass.*, 944 F.3d 9, 21 (1st Cir. 2019) (citing *Arizona v. United States*, 567 U.S. 387, 399 (2012)). Congress may impliedly preempt state or local laws that "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). This principle applies with particular force in the field of foreign affairs, where fragmented state or municipal sanctions regimes risk undermining the federal government's ability to speak with one unified voice in international relations. *Crosby*, 530 U.S. at 381.

Even in the absence of a directly conflicting federal statute, state and local laws may be invalid if they attempt to regulate areas reserved to the federal government. In *Zschernig v. Miller*, 389 U.S. 429 (1968), the Supreme Court struck down an Oregon statute restricting inheritance by nonresident aliens because it required state courts to evaluate foreign governments' policies. The Court held that laws with "more than some incidental or indirect effect in foreign countries" impermissibly intrude on the federal government's exclusive foreign affairs power. *Id.* at 434–35.

Similarly, in *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), the Court invalidated a California statute requiring insurers to disclose information about Holocaust-era insurance policies. The Court ruled that even without a directly preemptive federal statute, the California law conflicted with the federal government's diplomatic strategy and was preempted under the Supremacy Clause. The Court emphasized that the United States must "speak with one voice" in matters of foreign policy. *Id.* at 424.***Multiple***

### 2.   *Federal Circuits Have Applied These Principles to Invalidate State and Local Laws That Intrude on Federal Foreign Affairs*

The First Circuit has directly applied these principles to invalidate a Massachusetts law materially indistinguishable from the Ordinance at issue here. In *National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), the First Circuit struck down a Massachusetts statute restricting state agencies from purchasing goods or services from companies doing business with Burma. The court held that the law violated the federal foreign affairs power, the Foreign Commerce Clause, and was preempted by federal sanctions legislation. *Id.* at 45, 52, 61. The court rejected Massachusetts's argument that the market participant exception shielded the law from constitutional challenge, holding that there is no market participant exception to the foreign affairs power. *Id.* at 61–63. The Supreme Court affirmed on Supremacy Clause grounds in *Crosby* without

reaching the foreign affairs question, but the First Circuit's broader holding remains binding authority in this Circuit and provides an independent basis for invalidating the Ordinance.

The Ninth Circuit has also applied these principles to invalidate state statutes addressing international historical disputes. In *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067 (9th Cir. 2012) (en banc), the court struck down a California statute creating a cause of action for unpaid insurance policies issued to victims of the Armenian Genocide. Although the statute concerned private civil claims, the court held it was preempted because it "establishes a distinct political stance" on a sensitive international issue and thereby intruded upon the federal government's authority to conduct foreign relations. *Id.* at 1077. The court emphasized that the law was not "merely expressive" but rather created a "remedial scheme" that went beyond symbolic expression and into the domain of foreign affairs regulation. *Id.* at 1076–77. Similarly, in *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010), the Ninth Circuit invalidated a California law facilitating claims for Nazi-looted art because it constituted a state-level policy judgment regarding an international dispute.

In *Gingery v. City of Glendale*, 831 F.3d 1222 (9th Cir. 2016), the Ninth Circuit further clarified the boundary between permissible local expression and impermissible foreign affairs regulation. The court upheld a purely expressive monument but emphasized the critical distinction drawn in *Movsesian*: laws that create "remedial schemes or regulations" — as opposed to purely symbolic expressions — are far more likely to intrude on the federal foreign affairs power. *Id.* at 1229–31. The Ordinance here is not a symbolic expression; it is a regulatory mandate that compels divestment and restricts municipal financial relationships based on political judgments about foreign conduct. It falls squarely on the impermissible side of the line drawn in *Gingery* and *Movsesian*.

The Eleventh Circuit reached the same conclusion in *Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation*, 715 F.3d 1268 (11th Cir. 2013), affirming a preliminary injunction against Florida's "Cuba Amendment" — a state law barring companies doing business in Cuba from bidding on state contracts. The court held the statute was preempted under conflict preemption principles because it exceeded the scope of the federal Cuban sanctions regime, imposed additional penalties, and undermined the President's discretion to calibrate economic sanctions. *Id.* at 1281–82.

The Third Circuit likewise addressed the boundaries of state action touching foreign affairs in *Trojan Technologies, Inc. v. Pennsylvania*, 916 F.2d 903 (3d Cir. 1990). There, the court upheld a "Buy American" statute, but only because it did not single out any particular foreign country and did not require state officials to evaluate foreign regimes. *Id.* at 913. The court reasoned that "any state law that involves the state in the actual conduct of foreign affairs is unconstitutional." *Id.* The Medford Ordinance is distinguishable from the statute upheld in *Trojan Technologies* in every material respect: it targets specific categories of foreign conduct, requires municipal officials to make political judgments about foreign actors and international disputes, and imposes economic consequences based on those judgments.

Taken together, these decisions across the First, Ninth, Eleventh, and Third Circuits confirm a broad and well-established consensus: state and local governments may not adopt laws that impose economic consequences based on their own political judgments regarding international disputes, and such measures are preempted under the Supremacy Clause whether analyzed under field or conflict preemption principles.

   **3.** ***The Ordinance Intrudes Into the Field of Foreign Affairs Reserved to the Federal Government***

The Ordinance targets conduct with substantial foreign policy implications, including alleged "complicity" or "contribution" to "human rights violations" abroad. (Verified Compl. ¶¶ 16, 25.) By conditioning municipal financial relationships on political judgments about foreign conduct, the City has effectively adopted its own political and economic policy toward international disputes. Under *Von Saher*, *Movsesian*, and *Zschernig*, such measures impermissibly intrude into the field of foreign affairs reserved to the federal government and are preempted under the Supremacy Clause.

The Supreme Court's decision in *Crosby*, 530 U.S. 363, is directly on point. There, the Commonwealth of Massachusetts enacted a statute restricting state agencies from purchasing goods or services from companies doing business with Burma (now Myanmar). The statute effectively imposed state-level economic sanctions on companies connected to that country. The Supreme Court unanimously struck down the law as preempted by federal foreign policy. The Court emphasized that allowing states to impose their own sanctions would undermine the federal government's ability to "speak with one voice" in international relations. *Id.* at 381.The

 Ordinance raises the same constitutional concerns. By adopting a divestment regime directed at foreign conduct and by conditioning municipal financial relationships on political judgments about international disputes, the City effectively takes a position on ongoing international controversies and adopts a municipal foreign sanctions regime. Such measures exceed neutral municipal regulation and constitute a direct intrusion into the field of foreign affairs reserved to the federal government.

The Ordinance also creates inconsistent and fragmented sanctions across jurisdictions, undermining the uniformity essential to effective national foreign policy. (Verified Compl. ¶ 28.) Such effects are sufficient to trigger preemption regardless of the municipality's stated intent or the Ordinance's facial scope as a local fiscal measure. (Verified Compl. ¶ 29.)

### 4. *The Ordinance Cannot Be Justified as a Mere Spending or Procurement Decision*

Defendants may attempt to characterize the Ordinance as a simple exercise of municipal spending discretion. Courts have repeatedly rejected this argument. In *Crosby*, Massachusetts argued that it was merely deciding how to spend state funds when it barred state agencies from purchasing goods or services from companies doing business with Burma. 530 U.S. at 381. The Supreme Court rejected that argument and held that the law functioned as a sanctions regime directed at foreign conduct and therefore conflicted with federal foreign policy. *Id.* The Court explained that even when framed as purchasing restrictions, such measures can "undermine the intended purpose and 'natural effect' of federal law" and interfere with the federal government's diplomatic authority. *Id.* at 373. The Constitution does not permit states or municipalities to impose parallel economic pressure on foreign actors simply by channeling that pressure through procurement or investment policies.

The First Circuit's decision in *Natsios* provides an additional and independent basis for rejecting the spending-decision defense. The court expressly held that there is no "market participant exception" to the foreign affairs power. 181 F.3d at 61–63. Even if the Ordinance could be characterized as a proprietary decision about how to invest municipal funds, that characterization does not insulate it from foreign affairs preemption. The First Circuit's holding on this point remains binding authority in this Circuit.

9

The same reasoning applies here. The Ordinance conditions municipal investment decisions on political judgments about foreign conduct and seeks to impose economic consequences on entities associated with international disputes. In substance and effect, the Ordinance functions as a municipal sanctions regime. As in *Crosby* and *Garamendi*, such measures intrude on the federal government's authority to manage foreign relations and to determine the appropriate economic and diplomatic response to international disputes. Because local governments may not impose their own foreign-policy sanctions, even indirectly through spending or procurement rules, the Ordinance is preempted and should be enjoined.

### 5. *The Ordinance Is Independently Preempted Under Conflict Preemption*

Even if the Ordinance did not fall squarely within the field of foreign affairs, it is independently preempted under conflict preemption. Conflict preemption exists where compliance with both federal and state law is impossible or where state law stands as an obstacle to the accomplishment of federal objectives. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983). Courts determine the existence of a conflict by "examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.

Congress has enacted a comprehensive federal sanctions regime, administered by the Executive Branch, governing when and how economic sanctions may be imposed on foreign states, entities, and individuals. (Verified Compl. ¶ 22.) The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, authorizes the President to regulate or prohibit economic transactions with foreign persons and entities upon declaration of a national emergency. The Global Magnitsky Human Rights Accountability Act, 22 U.S.C. § 2656 note (Pub. L. 114-328, §§ 1262–65), authorizes the President to impose targeted sanctions — including asset freezes and

visa bans — on foreign persons responsible for gross violations of internationally recognized human rights or significant corruption. These statutes, together with the Office of Foreign Assets Control ("OFAC") regulations implementing them, constitute a comprehensive federal framework for determining when, how, and against whom economic sanctions are imposed for human rights violations and other foreign conduct.

Even where federal law does not mandate engagement with a particular foreign entity, the absence of federal sanctions reflects a deliberate federal policy choice that local governments may not countermand. (Verified Compl. ¶ 24.) As in *Crosby*, the Ordinance: (i) undermines federal flexibility with respect to international relations; (ii) contributes to a patchwork of local economic sanctions; and (iii) frustrates congressional intent to centralize foreign policy. The case for conflict preemption is "especially strong" where, as here, the President's inherent authority to act in the international sphere is paired with express or implied authorization of Congress placing Presidential power "at its maximum." *Crosby*, 530 U.S. at 375–76. The Ordinance is therefore preempted under both field and conflict preemption doctrines.

### B.  The Ordinance Exceeds Municipal Authority and Is Ultra Vires
#### 1.  *Massachusetts Municipalities Possess No Inherent Authority*

Massachusetts municipalities derive their authority to enact local ordinances from the Home Rule *Amendment to the Massachusetts Constitution, Article* 89 (1966), which grants cities and towns broad powers of local self-governance. That authority permits municipalities to regulate matters of local concern without seeking prior legislative approval, provided their enactments remain consistent with state law. Article LXXXIX permits local regulation only insofar as it is "not inconsistent" with state law. *Connors v. City of Boston*, 430 Mass. 31, 35 (1999) (cited in *Doe v. City of Lynn*, 472 Mass. 521, 528–29 (2015)). A municipality may not legislate in areas

preempted by the Legislature, nor may it contradict the purposes of a governing statutory scheme. *Boston Gas Co. v. City of Somerville*, 420 Mass. 702, 704–05 (1995). The Ordinance exceeds those constitutional limits.

The authority of the city to adopt the ordinance pursuant to the Home Rule Procedures Act is circumscribed by the margins of Massachusetts state law and/or federal law whose preemptive capacities, while not automatically presumed, void municipal legislation where it conflicts with Massachusetts state or federal law. Accordingly, any evaluation of a municipal action must begin with the scope and limits of home rule authority and the extent to which state law may preempt local regulation.

### 2.  *The Legislature Has Enacted a Comprehensive Statutory Framework Governing Municipal Investment*

The investment of municipal funds is not an open-ended area of local discretion. It is governed by a detailed statutory regime imposing fiduciary duties and prescribing substantive investment criteria. Massachusetts General Laws c. 44, § 55B mandates that municipal funds "shall be invested . . . at the highest possible rate reasonably available, taking account of safety, liquidity and yield," and that municipal officers "shall invest them prudently." This statute establishes: (i) a fiduciary duty of prudence; (ii) a mandate to prioritize safety, liquidity, and yield; and (iii) an obligation to secure the highest reasonable return consistent with those factors.

The Legislature has therefore defined both the exclusive governing objectives and the exhaustive range of permissible criteria for investment decision-making. When the Legislature enacts a "complete and comprehensive statutory system," there is no room for supplemental municipal regulation. *Bloom v. Worcester*, 363 Mass. 136, 154 (1973) (citing *Commonwealth v. Wolbarst*, 319 Mass. 291, 295 (1946)).

Massachusetts state law strictly governs municipal finance and investments, including: (i) G.L. c. 44, §§ 53, 55, 55B, which comprehensively regulate the City's use, disposition, and investment of funds; (ii) G.L. c. 44, § 54, imposing additional restrictions on trust funds; and (iii) G.L. c. 32 and c. 32B, imposing fiduciary duties on public fund managers. The statutory scheme governs custody of municipal funds, the identity of lawful depositories, the conditions under which municipal funds may be deposited, and the fiduciary responsibilities of the municipal treasurer. It assigns exclusive responsibility for deposit and safekeeping of municipal funds to the municipal treasurer, subject to state law and audit.

These statutes do not authorize municipalities to impose categorical, non-financial divestment mandates.

### 3. *The Ordinance Creates a "Sharp Conflict" With State Law*

Massachusetts courts invalidate local enactments where a "sharp conflict" exists with state law — either because legislative intent to preclude local action is clear or because the statutory purpose cannot be achieved in the face of the local measure. *Easthampton Savings Bank v. City of Springfield*, 470 Mass. 284, 289 (2014); *Grace v. Town of Brookline*, 379 Mass. 43, 54 (1979).

The conflict here is direct and irreconcilable. The Ordinance imposes categorical exclusions based on non-financial criteria unrelated to safety, liquidity, or yield. By mandating investment screens divorced from statutory fiduciary factors, the Ordinance: (i) substitutes political or ideological considerations for legislatively mandated prudential standards; (ii) restricts the investment universe irrespective of financial prudence; and (iii) interferes with the statutory directive to obtain the highest reasonably available return.

The statutory objective, maximizing return consistent with safety and liquidity consistent with fiduciary duty, cannot be achieved where the municipality is compelled to disregard otherwise

13

prudent and statutorily compliant investments for reasons outside the statutory framework. That is the definition of a "sharp conflict." *Easthampton Savings Bank*, 470 Mass. at 289.

The Ordinance further conflicts with G.L. c. 44 by adding substantive eligibility criteria for depositories not found in state law, reallocating authority from the treasurer to the legislative body, and forcing divestment from institutions that remain lawful under state statute. Such interference with statutorily assigned duties independently renders the Ordinance unlawful.

### 4. *Legislative Silence Is Not Delegation of Authority*

Advocates of the Ordinance may argue that because state law does not expressly prohibit non-financial screens, municipalities retain discretion to impose them. That argument reverses the governing principle.

The absence of prohibition does not create authority. Where the Legislature has defined governing investment criteria, additional criteria inconsistent with that framework are ultra vires. Home rule cannot expand delegated power beyond its statutory bounds. *Boston Gas Co.*, 420 Mass. at 704–05.

### 5. *The Ordinance Compels Municipal Fiduciaries to Violate Massachusetts Law*

Massachusetts imposes strict fiduciary obligations on those who manage public funds. G.L. c. 44, § 55B requires investment to achieve the highest reasonable return consistent with safety and liquidity. G.L. c. 32B, § 20 imposes a sole-interest rule and prudent-person standard for Other Post-Employment Benefits ("OPEB") funds. G.L. c. 32 governs pension funds and vests independent authority in trustees.

In *The Woodward School for Girls, Inc. v. City of Quincy*, 469 Mass. 151 (Mass. 2014), the Supreme Judicial Court held that a municipality serving as trustee of a charitable fund owed the same rigorous fiduciary duties as any other trustee, including the duty to invest prudently, to

protect the principal against inflation, and to act solely in the interest of the beneficiaries. The Court found that the city's failure to diversify the fund's investment portfolio and its near-total reliance on fixed-income instruments over decades constituted a breach of fiduciary duty, and it removed the city as trustee. Blanket divestment from entire industries without individualized financial analysis cannot be reconciled with these duties. The Ordinance unlawfully converts fiduciaries into political instruments and exposes them to personal liability for statutory violations.

The Ordinance places the municipal treasurer in an untenable and legally perilous position. By compelling the treasurer to make investment and depository decisions that conflict with state-law prudence standards, the Ordinance exposes the treasurer to potential personal surcharge, audit findings, and civil liability for breach of statutory fiduciary duties. (Verified Compl. ¶¶ 44–45.) Compliance with the Ordinance risks personal and professional liability for the treasurer, while noncompliance risks municipal enforcement, an irreconcilable conflict created by the City's unlawful action.

Massachusetts law does not permit municipalities to substitute moral or geopolitical preferences for statutory investment standards, nor may local governments compel pension and trust fiduciaries to violate duties imposed by the Legislature and enforced by the Supreme Judicial Court. Municipal ordinances inconsistent with state law are invalid. *Boston Gas Co.*, 420 Mass. at 704–05.

### 6. *Plaintiffs Have Standing*

Because this action is brought in federal court, Plaintiffs must satisfy the requirements of Article III standing. To establish standing, a plaintiff must demonstrate: (i) an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the

defendant; and (iii) that the injury would likely be redressed by judicial relief. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992).

The First Circuit has long recognized that municipal taxpayers possess standing to challenge unlawful municipal expenditures in federal court. In *Donnelly v. Lynch*, 691 F.2d 1029, 1031–32 (1st Cir. 1982), the First Circuit acknowledged the "long-established rule of municipal taxpayer standing" and held that municipal taxpayers had standing to challenge the constitutionality of a city-sponsored holiday display. The court distinguished the restrictive federal taxpayer standing doctrine of *Frothingham v. Mellon*, 262 U.S. 447 (1923), noting that the rationale for denying standing to federal taxpayers — that their interest in the federal treasury is too remote and indeterminate — does not apply with equal force to municipal taxpayers, whose relationship to the local fisc is far more direct. *Id.* at 1031.

Moreover, the First Circuit has recognized that even a "relatively small economic loss — even an identifiable trifle — is enough to confer standing." *Katz v. Pershing, LLC*, 672 F.3d 64, 76 (1st Cir. 2012).

Plaintiffs are residents, property owners, and municipal taxpayers of the City of Medford. (Verified Compl. ¶¶ 4–5.) The Ordinance mandates the unlawful management of municipal funds, exposing the City's investment portfolio to increased risk, reduced diversification, and foregone returns — concrete fiscal harms that are directly traceable to the Ordinance and redressable by the injunctive relief sought. (Verified Compl. ¶¶ 40–41.) Moreover, the Ordinance compels municipal fiduciaries to violate binding state-law duties, creating an irreconcilable conflict that constitutes ongoing, structural harm to the City's investment program. (Verified Compl. ¶¶ 44–45.) These injuries are neither speculative nor hypothetical; they are the direct and inevitable consequence of the Ordinance's implementation. Plaintiffs' standing is therefore firmly grounded in Article III.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

Once implemented, the Ordinance will compel unlawful divestment decisions that cannot be unwound without loss, while increasing portfolio risk and reducing diversification. The Ordinance will strip beneficiaries of statutory fiduciary protections otherwise codified by the Commonwealth in its fiduciary duty statutes governing trustees of public funds.

The Ordinance will subject Medford trustees to immediate legal and ethical conflicts between compliance with the Ordinance and their fiduciary duties in managing public funds. Loss of statutory rights and exposure to unlawful governance constitute irreparable harm as a matter of law. Monetary damages cannot restore prudent-investment safeguards after they are abandoned — particularly with respect to decisions made and funds lost in the interim.

Where a challenged governmental action is ultra vires or unconstitutional, irreparable harm is presumed. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of constitutional rights, even for minimal periods of time, constitutes irreparable injury). Deprivation of statutory investment authority and interference with the treasurer's exclusive statutory powers constitutes irreparable harm as a matter of law, because it strips state-created rights and duties that cannot be restored retroactively. The forced elimination of lawful, diversified investment options and the compelled concentration of municipal funds in a narrower pool of depositories causes ongoing structural harm to the City's investment program that cannot be undone after the fact.

## III.    The Balance of Equities Favors Injunctive Relief

Enjoining the Ordinance merely preserves the status quo ante and requires Defendants to comply with existing law. Defendants suffer no cognizable harm from being prevented from acting unlawfully. By contrast, allowing implementation risks permanent damage to public funds and fiduciary integrity.

Where the government is a party, the balance-of-equities and public-interest factors merge. *Nken*, 556 U.S at 435. The government has no legitimate interest in enforcing an unconstitutional or unlawful law. The balance of equities overwhelmingly favors immediate injunctive relief.

### IV.    The Public Interest Strongly Supports an Injunction

The public interest is served by: (i) uniform compliance with state investment statutes; (ii) protection of pensioners and taxpayers; (iii) preservation of federal foreign-policy primacy; and (iv) preventing the politicization of fiduciary decision-making. Courts have a strong interest in preventing municipalities from exceeding their lawful authority and exposing the public fisc to avoidable risk.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction enjoining Defendants from implementing or enforcing the Values-Aligned Local Investments Ordinance pending final resolution of this action.

Dated: April 16, 2026

Respectfully submitted,
/s/ *Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
LIBBY HOOPES BROOKS & MULVEY, P.C.
260 Franklin Street
Boston, MA 02110
(617) 338-9300
dbrooks@lhbmlegal.com

Mark Goldfeder*
Bencion Schlager*
Anat Alon-Beck*
David Benger*
NATIONAL JEWISH ADVOCACY CENTER (NJAC)
1954 Airport Road, Suite 1196

18

Atlanta, GA 30341
(332) 278-1100
mark@njaclaw.org
ben@njaclaw.org
anat@njaclaw.org
david@njaclaw.org

Rachel Sebbag*
THE GEVURA FUND
PO Box 1187
Gloucester, MA 01931
(978) 491-5414
rachel@njaclaw.org

*admission *pro hac vice* forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies/PDFs will be sent by regular mail/email on this date to those indicated as non-registered participants.

*/s/ Douglas S. Brooks*
Douglas S. Brooks